IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 6, 2025

**IN RE ALEXIS F. ET AL.**

**Appeal from the Juvenile Court for Jackson County**
**No. 2023-JV-28      Tiffany Gentry Gipson, Judge**

_____

**No. M2024-01316-COA-R3-PT**

_____

A mother and a father challenge the juvenile court's finding of two grounds for the termination of their parental rights and its finding that termination was in the best interests of the two children. We find that the juvenile court failed to make sufficient findings regarding one ground and vacate that ground. We affirm in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in Part and Affirmed in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and J. STEVEN STAFFORD, P.J., W.S., joined.

Michael Weston, Cookeville, Tennessee, for the appellant, Angellinna F.

Casey D. Brown, Cookeville, Tennessee, for the appellant, Brian F.

Jonathan Skrmetti, Attorney General and Reporter, and Katherine P. Adams, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

This appeal concerns the termination of parental rights of Angellinna F. ("Mother") and Brian F. ("Father") to Alexis F. (born in 2017) and Kaylob F. (born in 2021) (collectively "the children"). The Tennessee Department of Children's Services ("the Department" or "DCS") became involved with the family after receiving a referral that Kaylob was drug-exposed in utero. A DCS case manager, Kayla Defoor, spoke to Mother, who reported that she had taken oxycodone and THC during her pregnancy with Kaylob. Mother was drug tested twenty times during the pregnancy and tested positive for THC

sixteen times, oxycodone five times, and suboxone[1] twice. When Father was drug tested, the test returned positive only for his prescribed medication. When Ms. Defoor asked Mother and Father where the family was living, they reported that they were living with a friend. When asked whether this was true, the friend reported that the family was homeless and that he had previously let them stay with him. However, he reported that he had not seen the family since Kaylob's birth.

On February 10, 2021, DCS filed a petition in the Juvenile Court for Jackson County, seeking the protective supervision of the court over the children and to adjudicate them as dependent and neglected. The court entered an order directing Mother and Father to remain in contact with DCS and service providers. After this, Ms. Defoor attempted to connect Mother and Father with various services designed to assist them with completing items on their permanency plans. However, neither Mother nor Father gave Ms. Defoor the necessary documents regarding their income and housing, and neither parent remained in contact with these services.

Eventually, Ms. Defoor determined that Alexis was living with friends of Mother and Father. The entire family had been living with the friends; however, Mother and Father had been asked to leave, and only Alexis remained. Thereafter, Mother and Father continued to struggle to maintain stable housing, and at one point, they lived in a camper on someone's property. On March 2, 2021, the juvenile court placed both children into DCS's custody because the parents failed to maintain contact with the service providers, continued to have housing instability and drug problems, and failed to be truthful with DCS. The children were adjudicated dependent and neglected on April 6, 2021.

In October 2021, Mother and Father had completed several items on their permanency plans and were participating in unsupervised visits with the children. The following month, DCS returned the children to Mother's and Father's physical custody for a trial home visit. At this time, the family was living with a friend, and Mother was employed. However, Mother subsequently became unemployed, and the family was at risk of eviction. In January 2022, Mother tested positive for methamphetamine and amphetamine. Father claimed that he was unaware of Mother's drug use but admitted that he thought Mother had been acting strangely. After this, the trial home visit ended, and the children remained in foster care. When the children returned to the foster home, they appeared to have lost weight while in their parents' care, and Alexis, in particular, appeared underweight.

---

[1] Suboxone is a brand-name medication used to assist people in managing opioid addiction and reduce withdrawal symptoms. Mona Bapat, *Suboxone for Opioid Addiction Treatment*, AmericanAddictionCenters.org, https://americanaddictioncenters.org/suboxone (last updated June 20, 2025).

Following the end of the trial home visit, Mother submitted to several drug screens that returned positive for amphetamine, methamphetamine, methadone, and THC. Several tests returned negative results as well.

Mother and Father signed the criteria for termination on May 11, 2022. Numerous permanency plans were created during DCS's involvement with the family. These plans required Mother and Father to pay regular child support, attend all scheduled visits, create and maintain a budget, provide proof of a legal means of income, demonstrate their ability to financially support the children, obtain and maintain reliable transportation, and obtain and maintain safe and appropriate housing. The plans also required Mother to pass regular drug screens and pill counts.

On June 1, 2023, DCS filed a petition in the juvenile court seeking the termination of Mother's and Father's parental rights. In the petition, DCS alleged four grounds for termination: abandonment by failure to establish a suitable home, substantial noncompliance with permanency plans, persistence of conditions, and failure to manifest an ability or willingness to assume custody.

A trial on the petition was held on February 20, 2024. At the start of the hearing, DCS announced that it would not be pursuing the grounds of abandonment by failure to establish a suitable home and substantial noncompliance with the permanency plans. At the conclusion of the trial, the juvenile court directed the parties to submit proposed orders and that the court would then make an independent ruling on the petition. On August 6, 2024, the court entered an order, first finding all of DCS's witnesses to be credible and noting its concern that neither parent testified nor presented proof at the trial. The court made findings of fact regarding Mother and Father and concluded that these findings proved the grounds of persistence of conditions and failure to manifest an ability and willingness to assume custody by clear and convincing evidence. The court concluded that DCS had proven, by clear and convincing evidence, that termination of Mother's and Father's rights was in the children's best interests.

Both parents timely appealed. Mother and Father each present issues for our review, which we have consolidated and restated as follows: whether clear and convincing evidence established the existence of grounds for termination and whether clear and convincing evidence established that termination was in the children's best interests.

STANDARD OF REVIEW

Parents possess a fundamental constitutional interest in the care, custody, and control of their own children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). Indeed, this interest is "'far more precious than any property right.'" *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). It is in the public interest to allow

- 3 -

parents to raise their children as they wish without unjustified government interference. *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). Although this right is fundamental, it is not without limits, and when a parent has abandoned his or her child or acted in a manner that substantially harms his or her child, the state may institute proceedings to terminate the parent's rights. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010). A parent's rights may be terminated upon clear and convincing evidence that grounds for termination exist and that termination of the parent's rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

We review a trial court's findings of fact de novo upon the record with a presumption of correctness unless the preponderance of the evidence indicates otherwise. TENN. R. APP. P. 13(d); *In re Bernard T.*, 319 S.W.3d at 596. "[T]he reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524. The petitioner bears the burden of producing clear and convincing evidence proving both requirements in termination proceedings. *In re Angela E.*, 303 S.W.3d at 250. Clear and convincing evidence is that which "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596. "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

ANALYSIS

I.      Grounds for termination

A.  Ability and willingness

We first address whether the trial court erred in terminating Mother's and Father's parental rights for failing to manifest an ability and willingness to assume custody or financial responsibility of the children pursuant to Tenn. Code Ann. § 36-1-113(g)(14). This provision allows for a juvenile court to terminate a parent's rights when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).[2]

This ground contains two essential prongs that must be proven by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The first prong requires proof that "the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." *Id.* "If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.* at 677. Second, a petitioner must prove that placing the child in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *Id.* at 674.

Regarding the first prong, this element places "a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. When looking at whether a parent has demonstrated an ability, "we focus on 'the parent's lifestyle and circumstances.'" *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). When looking at the willingness of a parent, "'we look for more than mere words'" and examine if the parent has attempted "'to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child.'" *Id.* (quoting *In re Cynthia P.*, 2019 WL 1313237, at *8).

The juvenile court concluded that Mother and Father failed to manifest the ability or willingness to assume custody of the children. The evidence supports this conclusion. At the time of the trial, Mother and Father lacked stable housing, reliable transportation, and had failed to pay child support for the children. Since the children entered the state's custody in 2021, neither parent had demonstrated the ability to assume custody or financial responsibility for the children. Regarding Mother, the evidence at trial showed that Mother was reliant on the Department for transportation, and she would be unable to provide reliable transportation for the children to important medical visits or school. Mother resided in a sober living facility and would be unable to care for the children in this environment. Mother had also struggled with maintaining sobriety throughout the children's time in the state's custody. Regarding Father, testimony at trial supported that Father lacked housing and relied on others for transportation. This supports the court's conclusion that Father could not care for the children. Mother and Father had also failed to make meaningful progress towards completing the items on the permanency plans.

The finding that Mother and Father were unable to care for the children is supported by their actions during the trial home visit the children had with them. The children were

---

[2] All citations to the Tennessee Code refer to the version in effect as of June 1, 2023, when the petition for termination was filed.

returned to their parents' care in November 2021. The visit was terminated only two months later because Mother tested positive for methamphetamine and amphetamine. For his part, Father reported that he was unaware of Mother's drug use but stated that Mother had been acting strangely. By the end of the home visit, Mother was unemployed, and the family was at risk of eviction. For some reason, Mother and Father unenrolled Alexis from preschool and had to rely on the Department to transport the children to a doctor's appointment. When the children were returned to foster care, another DCS case worker reported that Alexis had lost weight and that both children appeared "sickly." Therefore, Mother and Father were unable to provide a safe and stable physical environment for the children. Consideration of all these facts supports the juvenile court's conclusion that the parents lacked the ability and willingness to assume custody or financial responsibility for the children.

The juvenile court also found that returning the children to Mother's and Father's care would pose a risk of substantial harm to their physical or psychological welfare "because the children would be without safe and appropriate housing and transportation to and from necessary events, such as school and doctor appointments." Notably, the court found that, should the children be returned to their parents' care, they would be at risk of becoming homeless and that this would, in turn, increase their risk of being abused or neglected. The evidence supports these conclusions.

The risk of substantial harm must be "'a real hazard or danger that is not minor, trivial, or insignificant,'" and "'[w]hile the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.'" *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). There is a risk of substantial harm when a parent lacks adequate housing. *See In re Jaylynn J.*, No. M2023-01496-COA-R3-PT, 2024 WL 2933349, at *13 (Tenn. Ct. App. June 11, 2024) (citing *In re Damium F.*, No. M2021-01301-COA-R3-PT, 2022 WL 3100560, at *10 (Tenn. Ct. App. Aug. 4, 2022)). Here, neither parent had adequate housing for the children. Mother resided in a sober living facility that would likely be unsuitable for the children. Although Father had attempted to obtain adequate housing, he had not yet met this goal at the time of the trial. Father was on several waitlists for low-income housing but had not yet found a place to live. Therefore, placing the children with either parent would pose a substantial risk to their physical welfare based upon a lack of housing.

Mother's history of substance abuse also poses a significant risk of harm to the children. Although Mother had tested negative for substances in the five months before the trial, she had a lengthy history of returning positive tests. Because of this, Mother had not shown that she could maintain sobriety. *See In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *16 (Tenn. Ct. App. July 6, 2021) (finding a risk of substantial harm despite the mother participating in rehabilitation because "she ha[d] not shown an ability to provide a home or necessary care for the children over a sustained period of

time"). Returning the children to Mother would, therefore, pose a risk of substantial harm to the children. We affirm the juvenile court's determination that DCS established this termination ground by clear and convincing evidence as to both parents.

### B. Persistence of conditions

The juvenile court also terminated the parental rights of Mother and Father pursuant to Tenn. Code Ann. § 36-1-113(g)(3). This ground is commonly referred to as "persistence of conditions" and provides for termination of parental rights in situations where:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:
>     (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>     (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>     (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A).

This ground focuses on the outcome of the parents' efforts at improvement, rather than the fact that the parents made the efforts. *In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005). It serves the purpose of "'prevent[ing] the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). In addressing this ground, courts must answer the question of "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

In the portion of its judgment terminating Mother's and Father's rights, the juvenile court made several findings relevant to this ground. Beginning with the statute's timing requirement, the juvenile court properly found that DCS filed a petition alleging that the children were dependent and neglected in February 2021 and that the children had been

removed from the parents' custody in March 2021. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A). The court made findings that the conditions that led to the child's removal still exist. *See id.* § 36-1-113(g)(3)(A)(i). Mother resided in a sober living home, and she continued to lack transportation. Father also continued to lack stable housing and transportation. Lastly, the court found that there is little likelihood that these conditions would be remedied in the near future. The evidence supports both of these findings.

However, absent from the court's order are specific findings addressing the requirement found in Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii).[3] The court did not make a finding regarding the effect the continuation of the parent-child relationship would have on the children. When this Court reviews a termination order, we "cannot simply review the record de novo and determine for ourselves where the preponderance of the evidence lies." *In re S.S.-G.*, No. M2015-00055-COA-R3-PT, 2015 WL 7259499, at *11 (Tenn. Ct. App. Nov. 16, 2015). Trial courts are "specifically directed by statute to 'enter an order that makes specific findings of fact and conclusions of law'" when entering an order terminating a parent's rights. *In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *13 (Tenn. Ct. App. Jan. 25, 2019) (quoting Tenn. Code Ann. § 36-1-113(k)). In instances such as this one, where a trial court has failed to make adequate findings to support a termination ground, the appropriate remedy is to vacate that portion of the court's order and remand for more detailed findings. *See, e.g., id.* Indeed, we have previously vacated a court's order terminating a parent's rights in cases where the court failed to make sufficient findings regarding each element found in Tenn. Code Ann. § 36-1-113(g)(3)(A)(i)-(iii). *See In re Dominic B.*, No. E2020-01102-COA-R3-PT, 2021 WL 774185, at *8 (Tenn. Ct. App. Mar. 1, 2021); *In re Ralph M.*, No. E2021-01460-COA-R3-PT, 2022 WL 3971633, at *17 (Tenn. Ct. App. Sept. 1, 2022).

We, therefore, vacate the juvenile court's findings on the ground of persistence of conditions. However, since we have found clear and convincing evidence of another ground, remand is unnecessary. *See In re Jordan P.*, No. E2022-00499-COA-R3-PT, 2023 WL 2770680, at *12 (Tenn. Ct. App. Apr. 4, 2023) ("[W]e have previously concluded that, where another ground for termination has been affirmed, the interest of judicial economy would be better served by simply vacating the ground and continuing with our review, rather than remanding the case.").

II.     Best interests

As we have determined that at least one statutory ground exists to terminate the parental rights of Mother and Father, we next consider whether the juvenile court properly

---

[3] Although neither party raised the issue of insufficient findings in their briefs, we are mindful of our Supreme Court's directive "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination . . . , regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted).

determined that termination of their parental rights is in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254.

Because not all misconduct is irredeemable, this state's parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). The best interests of the child are at the center of the court's inquiry, not what is best for the parent. *Id.* At this stage, the children's interests diverge from those of their parents, and the best interest analysis is conducted from the child's perspective, not the parent's. *In re Audrey S.*, 182 S.W.3d at 877-78. "Indeed, '[a] focus on the perspective of the child is the common theme' evident in all of the statutory factors." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d at 878). The facts considered in a court's best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When a court conducts the best interests analysis, it must consider the non-exclusive list of statutory factors found in Tenn. Code Ann. § 36-1-113(i). *In re Gabriella D.*, 531 S.W.3d at 681. This requires more than a "rote examination" of the statutory factors, *In re Audrey S.*, 182 S.W.3d at 878, or "tallying the number of statutory factors weighing in favor of or against termination." *In re Gabriella D.*, 531 S.W.3d at 682 (citing *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004)). "Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case." *In re Gabriella D.*, 531 S.W.3d at 682. To ensure that every parent receives the individualized consideration they are entitled to, "the best interests analysis is and must remain a factually intensive undertaking." *Id.* Any single factor may dictate the outcome of the analysis, *In re Audrey S.*, 182 S.W.3d at 878, but courts must always consider all of the factors and all relevant proof. *In re Gabriella D.*, 531 S.W.3d at 682.

The first statutory factor, factor (A), directs courts to consider "[t]he effect a termination of parental rights will have on the child[ren]'s critical need for stability and continuity of placement throughout the child[ren]'s minority." Tenn. Code Ann. § 36-1-113(i)(1)(A). The juvenile court found that termination would have a positive impact on these needs because the children are in a pre-adoptive home, which is the same home they have lived in since just after they entered foster care. The foster family had been Alexis's and Kaylob's parental figures for most of their lives, providing care and stability for the children. Relatedly, placing the children in Mother's or Father's homes would hurt their emotional and psychological conditions because Kaylob and Alexis are bonded with their

foster parents and are happy in their home. *See id.* § 36-1-113(i)(1)(B) ("The effect a change of caretakers and physical environment is likely to have on the child[ren]'s emotional, psychological, and medical condition[s]."). Testimony at the trial established that the foster home had been a good environment for the children, and the foster parents hoped to adopt the children. The children's foster mother testified that the children are bonded to her, her wife, their other children, and the foster parents' extended families. *See id.* § 36-1-113(i)(1)(H), (I) ("Whether the child[ren] ha[ve] created a healthy parental attachment with another person or persons in the absence of the parent[s]" and "[w]hether the child[ren] ha[ve] emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child[ren]'s access to information about the child[ren]'s heritage.").

The juvenile court found that neither Mother nor Father had demonstrated continuity and stability in meeting the children's needs. *See id.* § 36-1-113(i)(1)(C) ("Whether the parent[s] ha[ve] demonstrated continuity and stability in meeting the child[ren]'s basic material, educational, housing, and safety needs."). Neither parent provided any material support, other than snacks and meals during visits, to the children during the three years following the removal. Mother's and Father's lack of stable housing also weighs in favor of termination. Mother and Father unenrolled Alexis from her schooling during the trial visit that, again, was terminated due to Mother testing positive for illicit substances. Mother and Father have likewise not shown a lasting adjustment of circumstances such that it would be safe for the children to return to them because of their ongoing issues with housing and transportation. *See id.* § 36-1-113(i)(1)(J) ("Whether the parent[s] ha[ve] demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child[ren] to be in the home of the parent[s], including consideration of whether there is criminal activity in the home or by the parent[s], or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent[s] unable to consistently care for the child[ren] in a safe and stable manner."). Mother and Father also had only provided token support to the children during their time in DCS's custody. *See id.* § 36-1-113(i)(1)(S) ("Whether the parent[s] ha[ve] consistently provided more than token financial support for the child[ren].").

Alexis and Kaylob were removed due to drug use, housing instability, and mental health concerns, which all continued to exist, despite the Department's reasonable efforts. Although Mother resided in a sober living facility that was helping her address her substance abuse issues, Mother and Father had otherwise failed to take advantage of services designed to assist them in making such a lasting change in their circumstances. Mother and Father also failed to demonstrate a sense of urgency in seeking to regain custody of the children. *See id.* § 36-1-113(i)(1)(K), (L), (M) ("Whether the parent[s] ha[ve] taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions" and "[w]hether the department has made reasonable efforts to assist the parent[s] in making a lasting

adjustment in cases where the child[ren] [are] in the custody of the department" and "[w]hether the parent[s] ha[ve] demonstrated a sense of urgency ... seeking custody of the child[ren], or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child[ren]'s best interest[s].").

Mother and Father had not provided safe and stable care for the children or any other child. This is evidenced by the failed trial home visit, which exemplified the parents' housing instability and Mother's substance abuse issues. *See id.* § 36-1-113(i)(1)(O) ("Whether the parent[s] ha[ve] ever provided safe and stable care for the child[ren] or any other child."). Likewise, Mother and Father had not shown an understanding of the children's needs. After the home visit, the children were reported to appear "sickly," had lost weight, and had ear infections and upper respiratory ailments. Before removal, Alexis had developed dental problems that required dental surgery. *See id.* § 36-1-113(i)(1)(P) ("Whether the parent[s] ha[ve] demonstrated an understanding of the basic and specific needs required for the child[ren] to thrive."). Neither parent had adequate housing for the children, meaning that the physical environment of either parent would be unhealthy or unsafe for the children to live in. *See id.* § 36-1-113(i)(1)(Q), (R) ("Whether the parent[s] ha[ve] demonstrated the ability and commitment to creating and maintaining a home that meets the child[ren]'s basic and specific needs" and "[w]hether the physical environment of the parent[s'] home is healthy and safe for the child[ren].").

The remaining factors neither weigh in favor of nor against termination or are inapplicable to this case. Based on the foregoing, we determine that clear and convincing evidence existed to prove that termination was in the best interests of the children.[4]

CONCLUSION

The judgment of the trial court is vacated in part and affirmed in part. Costs of this appeal are assessed against the appellants, Angellinna F. and Brian F., for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

---

[4] Mother's and Father's primary arguments on appeal are that the juvenile court's factual findings underlying its best interest analysis were based on testimony that was not properly supported in the record. However, "[w]here the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary." *Schaeffer v. Patterson*, No. W2018-02097-COA-R3-JV, 2019 WL 6824903, at *4 (Tenn. Ct. App. Dec. 13, 2019) (citing *Franklin Cnty. Bd. of Educ. V. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010)). Neither parent has pointed to contrary evidence that meets the high standard for this Court to overturn the juvenile court's factual findings.